852 So.2d 478 (2003)
Colin TURNER, et al.
v.
MILLER TRANSPORTERS, INC.
Edward E. Skelton, et al.
v.
Miller Transporters, Inc.
Nos. 2002 CA 2278, 2002 CA 2279.
Court of Appeal of Louisiana, First Circuit.
June 27, 2003.
*481 Brady D. King, II, D. Brian Allen, Monroe, C. Michael Hart, Baton Rouge, Counsel for Plaintiffs-1st Appellants and Intervenors Colin Turner, et al.
Bruce Kuehne, Baton Rouge, Counsel for Intervenors Michael R. Taylor, et al.
Craig J. Robicheaux, Richard F. Knight, Bogalusa, Harold D. Miller, Jackson, MS, Counsel for Defendants-2nd Appellants Miller Transporters, Inc.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
FITZSIMMONS, J.
Turner Transporter, Inc., et al., surface freight equipment transporters (lessors), filed suit alleging an intentional breach of contract against Miller Transporters, Inc. (Miller), a certified motor carrier. Lessors demanded compensatory and punitive damages, as well as attorney fees. Following a denial and dismissal of their claims at the trial court level, lessors appealed the judgment. Miller answered the appeal. The judgment of the trial court is affirmed, in part, and reversed, in part.

I.

BACKGROUND
Lessors comprise approximately one hundred fifty private owners/operators of *482 tractors and/or power units engaged in the long hauling trucking industry. Pursuant to the terms of standardized written lease agreements, entitled "EQUIPMENT LEASE AND TRANSPORTATION AGREEMENT," lessors provided Miller with truck equipment and drivers to transport bulk commodities throughout the United States. The numerous equipment leases made the subject of this lawsuit were in operation at different times between April 18, 1987 until suit was filed on April 18, 1997. Lessors claim Miller intentionally breached the terms of the lease agreements when Miller deducted sums for the payment of liability insurance premiums from lessors' payments, when Miller failed to compensate plaintiffs for deadhead or non-revenue mileage, and when Miller failed to compensate lessors a percentage of accessorial charges.
The equipment leases provided that the leases would "be governed by and interpreted under the laws of the State of Mississippi." Pursuant to a pre-trial order issued on November 8, 2001, the court ruled that Mississippi's statute of limitations applied, ascribing a four-year limit for plaintiffs' claims. That same order also declared the deadhead mileage provisions in the equipment leases to be unclear and ambiguous, thus permitting the introduction of parol evidence. On December 19, 2000, the court ruled that plaintiffs with claims in excess of $50,000.00 would be entitled to a jury trial; however, those plaintiffs whose claims did not exceed the sum of $50,000.00 would try their cases before the court.
On May 3, 2001, the court granted Miller a partial summary judgment denying lessors a percentage of accessorial charges. Thereafter, on May 22-24, 2001, the case was tried before a jury. The jury determined that although Miller had breached its obligation to bear all costs of liability insurance premiums, lessors had "no right to recover damages with respect to costs of liability insurance premiums as a result of waiver, estoppel, or accord and satisfaction[.]" The jury also did not find Miller had breached its obligation to pay deadhead miles. Addressing those claims that did not exceed $50,000.00, the trial judge's determination varied from the jury's findings. The trial judge concluded that lessors had been damaged by Miller's back charge of insurance premiums to the lessors; however, it limited recovery to Mississippi's four-year statute of limitations. Moreover, the trial judge held that any party who had renewed a contract with Miller had waived, or was estopped from, the right to his or her claim. Thus, the trial judge determined that only those entities that had an initial contract for one rig within the preceding four years possessed a viable claim. The judge agreed with the jury that Miller had not breached its obligation to pay deadhead miles.
On appeal, lessors raise numerous issues associated with their claims for insurance premium reimbursements and deadhead mileage payments. Lessors allege error by the jury and/or the court in the court's:
(1) allowance of the introduction of pre-lease information packets, insurance memorandum and 30-day claim period;
(2) finding that lessors' insurance claims were waived by virtue of estoppel, waiver, or accord and satisfaction;
(3) finding that insurance premiums had been improperly deducted to only those lessors who had never executed more than one equipment lease or never added a tractor to existing lease;
(4) failure to instruct the jury that the deadhead mileage provision was ambiguous after so finding;
(5) improper denial of lessors' claims for deadhead mileage;

*483 (6) finding that the applicable prescriptive period was provided by Mississippi law as opposed to Louisiana law; and
(7) grant of Miller's motion for summary judgment on the skimming claim.
Miller has responded to the appeal with assertions that:
(1) the court failed to recognize that the jury had in actuality, adjudicated all of lessors' claims;
(2) lessors claims were preempted by federal law, limited to injunctive relief, and limited to eighteen months from the time of the offensive conduct;
(3) the court erred in its failure to admit extrinsic evidence, such as the pre-lease information packets and insurance memoranda, to prove an ancillary agreement; and
(4) the court erred in holding that some lessors possessed cognizable claims.

II.

INSURANCE CHARGE-BACKS

The Equipment Leases
At trial, four prototypes of the standard "EQUIPMENT LEASE AND TRANSPORTATION AGREEMENT" were introduced into evidence. The forms drafted by Miller represented the equipment lease agreements between lessors and Miller spanning the period between 1983 and the time of the trial date. Each of the introduced forms contained the following identical language:
Lessee shall procure and maintain in full force and effect liability insurance for injury to persons or property arising out of the use or operation of the Equipment in at least the amount required by the Interstate Commerce Commissioner the Department of Transportation and any rule or regulation issued thereunder for the protection of the public.
Lessor agrees at all times to keep in force insurance covering comprehensive loss of, or damage to, the Equipment, including, but not limited to, collision, upset, fire, and theft; and Lessor further agrees to release and hold harmless Lessee, its agents and employees, from and against any such loss or claim. Lessor further agrees to provide any other insurance coverage required for the operation of the Equipment, including bobtail coverage. Lessor shall be solely responsible for carrying and providing workers compensation insurance on all drivers and other employees of Lessor who are connected with or perform any service under this Agreement.
Section 16 of the lease agreement stated that the "lease shall be governed by and interpreted under the laws of the State of Mississippi." Prior to trial, counsel stipulated to that provision. Miller contended that its written obligation in the lease agreements to "procure and maintain" liability insurance that covers the lessors did not, thereafter, preclude Miller from deducting payments for the insurance premiums from the settlement sums paid to the lessors.

Federal Law
Leases between regulated carriers and owner-operators are subject to federal law. 49 U.S.C. § 14102, et seq. Prior to January 1, 1996, the Interstate Commerce Commission (ICC) had regulated licensed motor carriers. Owner-Operator Independent Drivers Association, Inc. v. New Prime, Inc., 192 F.3d 778, 781 (8th Cir. 1999), cert. denied, 529 U.S. 1066, 120 S.Ct. 1671, 146 L.Ed.2d 480 (2000). Pursuant to the authority of the ICC to issue regulations that govern owner-operator leases of equipment to authorized carriers, the regulations located in 49 C.F.R. § 376 were *484 promulgated. See 49 U.S.C. § 14102.[1] With the enactment of the Interstate Commerce Commission Termination Act (ICCTA) of 1995, the motor carrier regulatory functions and responsibilities were transferred from the ICC to the Department of Transportation and the Surface Transportation Board. 49 U.S.C. § 13501.
Code of Federal Regulations, Title 49, Part 376.12(d), mandates that compensation be specified in the written lease agreement. Pursuant to 49 C.F.R. § 376.12(h), which is entitled "Charge-back items," the regulation expressly states:
The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge. (Underlining supplied.)

Equipment Agreements after the ICCTA
Prior to 1996, 49 U.S.C. § 11705(b)(2) had provided liability "for damages" against a "common carrier," by relegating dispute resolution between private carriers and owner-operators to the administrative ICC. See Owner-Operator Independent Drivers Association, Inc., 192 F.3d at 780. Civil enforcement actions involving contract carriers were limited to injunctive relief. With the passage of the ICCTA, 49 U.S.C. § 14704 replaced 49 USC § 11705. Section 14704(a)(2) expanded damage actions against "a carrier or broker," thereby eliminating the distinction between common and contract motor carriers.[2] Thus, section 14704(a)(2) created a federal private right of action for damages in commercial disputes involving a violation of the regulations of the ICCTA. The passage of this enabling damage claim provision impacts the causes of action in the instant case because it raises the question of federal preemption as it applies to 49 C.F.R. § 376.12(h).
The police powers of the states are not to be superseded by federal regulation absent a clear and manifest purpose of Congress. Rice v. Santa Fe Elevator Corporation, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Preemption claims turn on Congress's intent. New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Company, 514 U.S. 645, 655, 115 *485 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995). Preemption may result not only from the enactment of a federal statute by Congress, but also pursuant to a federal agency's action within the scope of its congressionally delegated authority. Louisiana Public Service Commission v. F.C.C., 476 U.S. 355, 368-369, 106 S.Ct. 1890, 1898-1899, 90 L.Ed.2d 369 (1986) (citing Fidelity Federal Savings & Loan Association v. de la Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)).
Although the purpose of the federal regulations adopted pursuant to the Motor Carrier Act, and its successor ICCTA, was not to govern the terms for which the owner-operators and carriers would be allowed to negotiate, the aim of the regulations was to compel disclosure of the contract terms between them. The ICC's objective in imposing regulatory lease requirements for motor carriers was to insure truth-in-leasing by fostering disclosure. Tousley v. North American Van Lines, Inc., 752 F.2d 96, 101 (4th Cir. 1985), (citing "Lease and Interchange of Vehicles," Ex Parte No. MC-43 (Sub-No.7), 131 M.C.C. 141, 156-08 (1979)).
Miller breached the explicit, federally regulated requirement to delineate all charge-backs. Miller's breach contravened the express provision of the federal mandate of 49 § C.F.R. 376.12(h) and the purpose for which it was promulgated. The provision of the lease agreements that Mississippi law would govern the interpretation of the contract cannot supersede the federally enacted cause of action for damages by lessors for Miller's breach of the specific federal terms that regulate motor carriers. Thus, any claims for damages related to a violation of 49 C.F.R. § 376.12(h), that arose on or after January 1, 1996, fall under the aegis of federal law, rather than the law of Mississippi. Given the clear wording of the ICC regulation relative to charge-backs, the jury and trial court did not err in their finding that Miller had breached the contract's federally mandated requirement to disclose all sums of insurance premium charge-back payments in the written lease agreement. However, any waiver provisions of Mississippi are inapposite to this federal requisite. Therefore, the jury and trial judge legally erred in their interpretations that lessors waived their claims with recurrent contracts; and, that there was tacit acceptance of the deducted insurance premium amounts with payments or settlements.

Equipment Agreements prior to ICCTA
Congress failed to address the issue of the retroactivity, vel non, of the new cause of action for damages pursuant to 49 U.S.C. § 14704. Section 14704(a)(2) potentially increases a party's liability for past conduct, or relegates new responsibilities with respect to finalized transactions. The imposition of liability for conduct where none appeared to have previously existed exceeds a mere change in the forum in which a pending dispute could be brought. As noted above, the legislation created a cause of action and damages which were not contained in the predecessor statute. Thus, the scope of the amendment is extended beyond a mere procedural change. Given the substantive impact of section 14704, it cannot be deemed to be retroactive in its application. See Landgraf v. USI Film Products, 511 U.S. 244, 363-264, 114 S.Ct. 1483, 1496, 128 L.Ed.2d 229 (1994). Accordingly, a federal private right of action for damages based on a breach of the contract is limited to those contracts in existence on and after January 1, 1996, when ICCTA became effective. To the extent that federal law does not preempt state law, the parties were free to agree that the laws of Mississippi would govern and interpret the lease *486 agreements. MS-ST § 75-1-105.[3] Accordingly, any claims for damages incurred before January 1, 1996, would be premised on Mississippi law to which the parties had contractually agreed.
The jurisprudence of Mississippi holds that issues involving the construction of contracts constitute questions of law allotted to the court's interpretation, rather than questions of fact assigned to the fact finder. Parkerson v. Smith, 817 So.2d 529, 532 (Miss.2002). Appellate courts employ a de novo standard of review of the construction of a contract. The terms provided in the equipment leases under review are unequivocal in the placement of the duty on Miller to "procure and maintain" liability insurance coverage for operators of the equipment. In the following paragraph, the lease requires lessors to provide comprehensive coverage, as well as any other insurance required for the operation of the "Equipment," including bobtail coverage. Nowhere in the lease agreement is there any verbiage even suggesting that lessors would be responsible for payment of any portion of the liability insurance premiums. A clear and unambiguous contract is to be enforced as written. Delta Pride Catfish, Inc. v. Home Insurance Company, 697 So.2d 400, 404 (Miss.1997). The jury and the trial court did not err in their conclusions that Miller had violated the terms of its equipment lease agreements with lessors by unilaterally charging lessors a portion of the premium sums it had agreed to pay. This court's affirmation that the lease provision was breached renders moot lessors' assignment of error that the pre-lease packets and insurance memoranda were erroneously allowed into evidence at trial.
Statute of Limitations/Prescription
Lessors maintain that Louisiana law should determine the viable prescriptive period for advancing claims associated with the alleged breach of lease contract. The parties' contractual agreements provided that the lease should be "governed by and interpreted under" Mississippi law. Miller contends that Lessors were bound by a thirty-day period provided in the lease agreements or, alternatively, by the statute of limitations prescribed by Mississippi.
Section 18 of the equipment leases provided, in relevant part:
TIME FOR PRESENTATION OF CLAIMS-LIMITATIONS AND WAIVER;
Lessor shall present to Lessee all claims for compensation due for services performed hereunder, and all claims for mileage or other reimbursements, within thirty (30) days from the time such services are provided. Lessor agrees that failure to present any claim within said thirty (30) day period shall excuse Lessee's obligation to pay said claim and preclude Lessor from any further attempts at collection, notwithstanding the existence of any other statute of limitations or provisions herein...."
We interpret and apply this provision for a thirty-day limitation period as the initial time within which a lessor is required to file a claim with Miller. Lessors' initial claims for compensation for motor vehicle equipment hauls were not an *487 issue litigated by the parties in the instant case; therefore, the thirty-day period is not germane.
In considering whether Louisiana prescription or the Mississippi statute of limitations applies, it has been noted that Louisiana generally permits parties to select the law that will determine the outcome of disputes involving a contract. Verdine v. Ensco Offshore Company, 255 F.3d 246, 250 (5th Cir.2001). The provisions of La. C.C. art. 3549 establish general guidelines to enable conflict of law resolution. Article 3537 primarily addresses those circumstances in which no state has been previously selected to govern a contract or legal relationships. Thereafter, La. C.C. art. 3540 states: "All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537." Thus, the burden rests with lessors to demonstrate that the law of Louisiana would have been applicable to the issue under article 3537 and that the chosen law of Mississippi contravenes the public policy of Louisiana. Lessors have failed to suggest a public policy that would be violated by the application of the Mississippi statute of limitations pursuant to the governance of the contract under Mississippi law. Nor is this court aware of any adversely impacted public policy by the application of Mississippi law. The trial court did not err in its application of the Mississippi statute of limitations to lessors' claims for breach of contract. It is uncontested that a four-year statute of limitations applies pursuant to MS-ST § 75-2A-506. Accordingly, the Mississippi four-year statute of limitations, and not Louisiana or federal law, would bar those claims that arose before April 18, 1993.[4]

Waiver
We next address the issue of waiver of claims for breaches occurring within Mississippi's extant window of procedural viability, i.e., between April 18, 1994 and January 1, 1996. Waiver of a right to which one is otherwise entitled is recognized by the Mississippi courts. Canizaro v. Mobile Communications Corporation of America, 655 So.2d 25, 29 (Miss. 1995). A waiver presumes awareness and the intentional relinquishment through acts or omission of a right. It contemplates modification or change of an existing right or of the terms and conditions of a contract that results in the voluntary surrender of a right. Ewing v. Adams, 573 So.2d 1364, 1369 (Miss.1990).
The evidence presented at the trial of the instant matter reveals that the liability insurance premium sums that were charged back to lessors by Miller were reflected on the lessors' monthly settlement sheets. Thus, lessors knew shortly after entering into each lease agreement with Miller that the charge-backs had transpired. Lessors maintain that they verbally complained to the representatives of Miller about the breach throughout the years; however, they simultaneously continued to operate under, and renew, their lease agreements. A waiver may be inferred from the actions and conduct of the parties. Brent Towing Company, Inc. v. Scott Petroleum Corporation, 735 So.2d *488 355, 359 (Miss.1999). The waiver by the subsequent conduct of the parties of a requirement that a modification be in writing applies to transactions governed by the Mississippi Uniform Commercial Code. Canizaro, 655 So.2d at 29-30. Expressions of displeasure, without enforcement of one's rights, do not rise to the level of action that prevents acquiescence and waiver of the right to object. Vice v. Leigh, 670 So.2d 6, 10 (Miss.1995). Moreover, a contracting party, who is aware of a breach by the other party, waives the breach if he receives money in the performance of the contract. Brent Towing Company, Inc., 735 So.2d at 359.
We find no manifest error in the trial court's conclusion that lessors, who had evidenced acquiescence in prior equipment leases, waived their right to object to the insurance premium charge-backs in subsequent lease agreements. In this regard, the jury erred in its failure to exclude those lessors who might not have previously acquiesced from its determination that there had been a waiver, accord and satisfaction, or estoppel. That portion of the jury verdict is hereby reversed.

III.

DEADHEAD MILES
Lessors claimed that Miller additionally breached the contract agreements by its failure to honor its obligation to compensate for "deadhead" miles. Miller responded that lessors were seeking compensation for miles connected with a load, which was expressly excluded pursuant to the terms of the lease agreements.
The stipulation that Mississippi law governed the interpretation of the contract directs this court to look to Mississippi jurisprudence and statutory guidance. At the outset, it is observed that any claims that Miller violated its contractual agreements to compensate lessors for "deadhead" miles would be subject to Mississippi's four-year statute of limitations. MS-ST § 75-2A-506.[5] With respect to those equipment contracts that would fall within the viable four-year period, Schedule "B" of each lease agreement stated:
Compensation for empty mileage, if any, shall be the responsibility of Lessor (owner). If, however, Lessor is to be compensated for empty mileage in any instance, the basis of such compensation shall be set forth in a separate memorandum agreement to be made a part of the Lease, otherwise Lessor (owner) shall have no basis for compensation for empty mileage.
Thereafter, Schedule "C" of the same agreements stated: "Lessee will pay Lessor.78 cents per mile for all deadhead (non-revenue) miles. Note: Any miles connected in any way with a load are not considered deadhead miles."
The trial court ruled that the clause in Schedule "C" relating to payment for deadhead miles was ambiguous; therefore, parol evidence was allowed at trial. Mississippi jurisprudence holds that issues involving the construction of contracts constitute questions of law allotted to the court's interpretation, rather than questions of fact assigned to the fact finder. Parkerson, 817 So.2d at 532. Appellate courts in both Louisiana and Mississippi employ a de novo standard of review of the *489 construction of a contract. Warwick v. Gautier Utility District, 738 So.2d 212, 215 (Miss.1999); Montz v. Theard, XXXX-XXXX, p. 5 (La.App. 1 Cir. 2/27/02), 818 So.2d 181, 185. Intent should first be considered pursuant to an objective consideration of the four corners of the contract to the exclusion of parol or extrinsic evidence, whenever possible. Cooper v. Crabb, 587 So.2d 236, 239 & 241 (Miss.1991). Only if the meaning of a term is unclear or ambiguous should the court go beyond the text to permit extraneous evidence in the ascertainment of the parties' true intent. Heritage Cablevision v. New Albany Electric Power System of City of New Albany, Mississippi, 646 So.2d 1305, 1313 (Miss. 1994); Delta Pride Catfish, Inc., 697 So.2d at 403-404. Moreover, vague or ambiguous terms are construed more strongly against the party preparing the instrument. Thornhill v. System Fuels, Inc., 523 So.2d 983, 998 (Miss.1988).
In the matter at hand, the lease agreements contained no definition of "deadhead," and the notation in the second sentence of Schedule "C," which referenced deadhead mileage, provided only limitations. Given the lack of clarity of the parameters or interrelationship of the terms "non-revenue" and "in any way connected," as they refer to "deadhead," this court attaches no legal error to the trial court's ruling that the intended meaning of coverage for deadhead mileage could not be construed absent extrinsic evidence.[6]
Herschel D. Townsend, an owner-operator/lessor of a truck, testified that the truck industry's definition of deadhead miles was synonymous with "empty" miles, i.e., miles during which no load was transported. In contrast, William H. Roberts, the recently retired executive vice-president of Miller, who had drafted the contract clause that referenced deadhead miles, distinguished the term "empty" from "deadhead." To qualify as deadhead, or nonproductive, miles, Miller stated that the trucker had to perform work for the company for which no revenue was generated. The travel could not involve any movement for a shipper.
The language in Schedule "B" expressly gave the lessors the financial responsibility for "empty" miles in the absence of a separate written agreement.[7] Schedule "C," which mentions "deadhead," does not refer to "empty," instead, it contains restrictive language, such as "non-revenue" and excludes compensation for travel that is "connected in any way with a load." Eddie Smith, manager of Miller's owner-operator division, stated, via affidavit, that the pre-lease information packages were distributed to lessors beginning on April 19, 1989. Lessors challenge the receipt of copies of the pre-lease packages; however, the pre-lease information packages' reference to deadhead and empty miles serves to elucidate Miller's intent. The package explicitly informs the lessors that the lease *490 agreement specifies a percentage of "compensation... per mile for all deadhead (non-revenue) miles. This should not be interpreted to mean normal empty miles associated with a load."
Given the initial exclusionary language in Schedule "B," the restrictive terminology in Schedule "C," and the pre-lease packages, as well as the testimony by the witnesses, we do not attribute any error to the jury and court's implicit conclusion that the lease did not provide that "empty" miles would be compensated.

IV.

ACCESSORIAL CHARGES
The court granted Miller a partial summary judgment on the issue that lessors' compensation did not include a portion of accessorial charges billed to the shippers. Louisiana and Mississippi courts conduct a de novo review of appeals from a summary judgment, using the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Titus v. Williams, 844 So.2d 459, 464 (Miss.2003); Sanders v. Ashland Oil, Inc., 96-1751, p. 7 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1035, writ denied, 97-1911 (La.10/3197), 703 So.2d 29.[8]
As with the previous allegations of breach of contract, the Mississippi four-year statute of limitations precludes any claims for breaches that occurred prior to April 18, 1993. Addressing the remaining contracts, the terms of all equipment lease agreements confected after September 1992 stated in "Schedule `B'":
In the event the owner of a tractor (Lessor) desire[s] to lease his tractor to Lessee (carrier) andit is driven by him or his employee, the following shall apply:
(1) Compensation to Lessor (owner) shall be___ percent (___%) of gross line-haul revenue excluding any built in flat rate cleaning charge collected by Lessee (carrier) for each load pulled on a dedicated trailer with no backhaul involved.
...
(3) Lessor (owner) shall receive ___ percent (___%) of the gross line-haul revenue, excluding any built in flat rate cleaning charge collected by the lessee (carrier), for all other loads hauled. (Emphasis supplied.)
The federally enacted regulations enunciated in 49 C.F.R. § 376.12(e) direct in pertinent part: "The lease shall clearly specify the responsibility of each party with respect to ... accessorial services.... The lease shall clearly specify who is responsible for loading and unloading the property onto and from the motor vehicle, and the compensation, if any, to be paid for this service."
Any alleged breaches of contract related to accessorial charges that occurred on or after January 1, 1996, the effective date of the ICCTA, are subject to a federally based cause of action for damages. Federal regulations require that accessorial charges be delineated. If the above referenced lease clause did not, in fact, refer to accessorial charges, as Miller purports, the lack of inclusion of a provision in the lease agreements related to accessorial charges would be anathema to, and in direct violation of, 49 C.F.R. § 376.12(e).
Distinguishably, federal law has not preempted interpretation of the terms of an agreement; therefore, we look to Mississippi *491 law pursuant to the equipment lease agreements. Again, this court is presented with terminology for which no definitions have been provided within the agreements. There is no description or list of "accessorial charges"; nor is the critical phrase, "gross line-haul revenue," circumscribed.
Reviewing the contractual agreements historically, it is noted that until 1992, the compensation term of the leases stated that lessors were not entitled to a portion of the accessorial charges, unless it was specifically stated in the contract. Beginning in 1992, the new lease forms failed to include the general exclusionary language relative to accessorial charges. In its memorandum in support of the motion for partial summary judgment, the manager of the owner-operator division of Miller maintained that the language had been inadvertently omitted. He characterized accessorial charges to include services such as additional pumping services and time waiting to unload beyond the contracted for time. He also attested to Miller's never having paid a lessor part of the revenue from an accessorial charge, unless such had been specifically provided for in a schedule to the lease agreement. Yet, Schedule "B" of the lease agreement forms after 1992 failed to state that lessors would not be entitled to accessorial charges unless they were itemized. Instead, Schedule "B" entitled lessors to a specific percentage of the "gross line-haul revenue." The single itemized exclusion was the flat rate cleaning accessorial charge to which lessors were definitely not entitled.
The contract was drafted by Miller, and any ambiguities must be construed against it. Wade v. Selby, 722 So.2d 698, 701 (Miss.1998). A fortiori, lessors cannot be penalized by Miller's inadvertent omissions from the written contract. The word "gross" is defined as "general, broad: consisting of an overall total before any deductions...." Webster's New Encyclopedic Dictionary, 441 (3d ed.1994) (letters and numbers deleted). A plain reading of the term "gross line revenue" supports the inclusion of any and all sums associated with charges to the shipper. It would, therefore, encompass any accessorial charges not expressly excluded. Miller has not demonstrated through its supporting documentation that "gross line-haul revenue" did not entail accessorial charges other than the flat rate cleaning charge.
Notwithstanding the presence of a violation of the lease agreements, any breach of the accessorial charges provision of the equipment leases that occurred between April 18, 1993 and January 1, 1996 was waived in the same manner that lessors waived their claims against insurance charge-backs. Canizaro, 655 So.2d at 25, 29-30; Brent Towing Company, Inc., 735 So.2d at 359. Thus, if lessors had renewed prior lease agreements, thereby exhibiting acquiescence to Miller's failure to pay accessorial charges, the lessors concomitantly waived their right to object to the accessorial charges violation in the subsequent leases. As such, the summary judgment is reversed with respect to those claims for breach of contract that arose on or after January 1, 1996, and for those claims between April 18, 1993 and January 1, 1996 that were not waived by acquiescence to Miller's violation based on prior identical written agreements. Summary judgment in favor of Miller is affirmed for the remaining equipment leases.

V.

JURISDICTIONAL AMOUNTS
Finally, Miller filed a pre-trial motion to strike plaintiffs' jury demand. The trial court ordered that that those persons whose claims did not exceed $50,000.00 would not be entitled to a jury trial; *492 whereas, those plaintiffs whose claims exceeded $50,000.00 would be entitled to trial by jury. In its answer to the appeal, Miller now posits that all claims were, in fact, tried before a jury. Miller claims the trial court legally erred in two respects: (1) its failure to recognize that as long as any claims in good faith exceeded the jury trial threshold, the plaintiffs' claims were triable by jury; and (2) the failure of the court to specify prior to trial which claims were either above or below the $50,000.00.
Given this court's conclusion that the jury erred in failing to recognize that a waiver would not apply to those lease arrangements in which the lessors had not previously acquiesced to the insurance premium charge-backs, the issue of the court's review of a portion of those claims is mooted. In all other respects, the court findings tracked the jury verdict; therefore, any purported procedural misstep is immaterial to the outcome of this case and needs no further consideration.

DECREE
This court reverses the portion of the trial court's judgment holding that breaches of the insurance charge-back provision of equipment lease agreements after January 1, 1996 were waived. With respect to lease agreements wherein Miller breached its contractual duty to assume ultimate financial responsibility for liability insurance between April 18, 1993 and January 1, 1996, the portion of the jury verdict and judgment that ascribed a waiver, accord and satisfaction, or estoppel to those lessors who had not previously evidenced acquiescence in the charge-backs, is reversed.
Summary judgment by the court in favor of Miller on the basis that lessors' compensation did not include a portion of accessorial charges for alleged breaches on or after January 1, 1996, is reversed. Summary judgment in favor of Miller for claims of breaches of the accessorial charges provisions of the lease agreements between April 18, 1993 and January 1, 1996, is reversed for those claims not waived by lessors as a result of prior acquiescence with contract renewals.[9]
The case is remanded for a hearing to ascertain which individual petitioners' claims do not exceed $50,000.00, and would, therefore, not be subject to trial by jury on the issues of accessorial charges and insurance charge-backs, and for further action consistent with this opinion. In all other respects, the trial court judgment is affirmed. Costs associated with this appeal are to be divided such that one-half of the costs is assessed to lessors and one-half of the costs is assessed to Miller.
AFFIRMED, IN PART; REVERSED, IN PART; REMANDED.
NOTES
[1] 49 U.S.C. § 14102 enables the Secretary of Department of Transportation to promulgate regulations which govern owner-operator leases of equipment to authorized carriers. That statute provides in pertinent part:

"(a) General authority of Secretary. The Secretary [of Transportation] may require a motor carrier providing transportation ... that uses motor vehicles not owned by it to transport property under an arrangement with another party to -
(1) make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier;...."
[2] 49 U.S.C. § 14704 states: "A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier." See David N. Giermanski, The Re-regulation of Freight Forwarders in the USAMexico Border, 9-WTR International Trade Journal 11.

Moreover, the report of the House Transportation and Infrastructure Committee specifically stated that § 14704 of the House Bill would "provide for private enforcement of the provisions of the Motor Carrier Act in court. This expands the current law which only permits complaints brought under the Act to be brought before the ICC." H.R.Rep. No. 104-422, at 120-121 (1995), reprinted in 1995-2 U.S.C.C.A.N. 793, 832-833.
[3] In Louisiana, issues of conventional obligations are generally governed by the law expressly chosen or clearly relied upon by the parties, unless that law contravenes the public policy of the state whose law would otherwise be applicable if its policies would be more seriously impaired by not applying its law. La. C.C. arts. 3537 and 3540. There has been no viable demonstration that the policies of Louisiana would be more seriously impaired by applying Mississippi law to the consideration of the controverted issues.
[4] MS-ST § 75-2A-506(1) states, in relevant portion: "An action for default under a lease contract ... must be commenced within four (4) years after the cause of action accrued." For breaches of contracts not subject to Mississippi's Uniform Commercial Code or another specific statute, a three-year statute of limitations is operative pursuant to MS-ST § 15-1-49.
[5] Miller's contention that lessors' claims are barred by the thirty-day period delineated in section 18 of the equipment lease agreements lacks merit. As noted previously, we interpret section 18 to apply to original claims to Miller for payments by lessors based on bills of lading. Miller does not contend that the lessors failed to present any requests for payment following completion of hauls.
[6] We do not assign any error in the court's failure to instruct the jury that the deadhead mileage provision was ambiguous. The effect of the trial court's ruling on ambiguity of the provision was the allowance of the introduction of parol evidence. The jury heard the parol evidence; therefore, it was not deprived of any information upon which to reach a verdict. Moreover, this court deems the assignment of error to have been abandoned because lessors failed to submit a brief on the issue. "All specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed." Uniform RulesCourts of Appeal, Rule 2-12.4.
[7] Miller complied with the regulatory requisite of 49 C.F.R. § 376.12(e), which requires that the lease clearly specify "the responsibility of each party with respect to ... empty mileage ...."
[8] Pursuant to the terms of the contract, Mississippi substantive law applies to the interpretation of the lease agreements. However, procedural issues fall within the purview of Louisiana.
[9] On appeal, lessors argue that the grant of summary judgment in favor of Miller was in error; however, lessors failed to appeal the denial of lessors' own motion for summary judgment on the issue of accessorial charges. This court is thus procedurally constrained to limit its decree to a reversal of the summary judgment in favor of Miller.